**RECORD NO. 13-4920**

In The

# United States Court Of Appeals
## For The Fourth Circuit

# UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

**v.**

# CLAYTON DOYLE BULLIN, a/k/a Doyle Bullin,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
AT STATESVILLE**

_____

**BRIEF OF APPELLANT**

_____

**Michelle Anderson Barth**
Law Office of
  Michelle Anderson Barth
**P. O. Box 4240**
**Burlington, VT  05406**
**(619) 894-7817**

*Counsel for Appellant*

# TABLE OF CONTENTS

**PAGE:**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

I.    STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     A.    Basis for Subject Matter Jurisdiction in the District Court . . . . . . . . 1

     B.    Basis for Jurisdiction in the Court of Appeals . . . . . . . . . . . . . . . . . . 1

     C.    The Notice of Appeal was Timely . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     D.    The Judgment is Appealable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     A.    Procedural and Factual History . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

          1.    The Underlying Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

          2.    The Violation Petition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          3.    The Status Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          4.    The Violation Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.   SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

V.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

     A.    The District Court Failed to Comply with the Fifth Amendment
          Right to Due Process and Federal Rule of Criminal Procedure
          32.1(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

i

1.  The Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

2.  Due Process and Federal Rule of Criminal Procedure 32.1(b)(2) in the Context of a Supervised Release Violation Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

3.  The District Court Failed to Comply with Requirements Under Fed. R. Crim. P. 32.1 and the Due Process Clause of the Fifth Amendment That It Explicitly Balance the Interests of Justice Before Denying Mr. Bullin's Right to Confront a Witness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

4   A Review of the Record Reveals That Any Balancing of Interests Would Have Weighed in Favor of Mr. Bullin's Right of Confrontation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

B.  The District Court Imposed an Unreasonable Sentence . . . . . . . . . . 32

1.  Standard of Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

2.  The District Court Imposed the Maximum Possible Sentence, but in So Doing, Did Not Account for the Need to Avoid Unwarranted Sentencing Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct . . . . . . . . . . . . . . . . . 33

3.  The District Court Committed Procedural Error when It Failed to Consider and Weigh 3553(a)(6) and Adequately Explain How the Maximum Sentence it Imposed Was Justified . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

4.  The Sentence Is Substantively Unreasonable Because the District Court Appeared to Give Too Much Weight to Some Factors at the Expense of § 3553(a)(6) Factors That Were Presented by Bullin  . . . . . . . . . . . . . . . . . . . . . . . . 37

ii

VI.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

VII.    REQUEST FOR ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**PAGE(S):**

**CASES:**

*Blanco de Belbruno v. Ashcroft*,
    362 F.3d 272 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Delaware v. Van Arsdall*,
    475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986) . . . . . . . . . . . . . . 27

*Duty v. East Coast Tender Service, Inc.*,
    660 F.2d 933 (4th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Gagnon v. Scarpelli*,
    411 U.S. 778 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Morrisey v. Brewer*,
    408 U.S. 471 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Rita v. United States*,
    551 U.S. 338, 127 S. Ct. 2456, 168 L. Ed. 2d 203 (2007) . . . . . . . . . . . . . 35

*United States v. Bautista-Villanueva*,
    2013 WL 6098425 (4th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Carter*,
    564 F.3d 325 (4th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Crudup*,
    461 F.3d 433  (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Davis*,
    720 F.3d 215 (4th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21, 33, 34

iv

*United States v. Delfino*,
    510 F.3d 468 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Doswell*,
    670 F.3d 526 (4th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 26, 27

*United States v. Jordan*,
    742 F.3d 276 (7th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Legree*,
    205 F.3d 724 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Lloyd, Jr.*,
    566 F.3d 341 (3rd Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Minnitt*,
    617 F.3d 327 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Mouldren*,
    478 F.3d 652 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Paul*,
    561 F.3d 970 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Recendiz*,
    557 F.3d 511 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Ressam*,
    679 F.3d 1069 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Thompson*,
    595 F.3d 544 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**STATUTES:**

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 3553(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

18 U.S.C. § 3553(a)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

18 U.S.C. § 3553(a)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

18 U.S.C. § 3553(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

18 U.S.C. § 3553(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

18 U.S.C. § 3553(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 3553(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

18 U.S.C. § 3559 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

18 U.S.C. § 3583(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 3583(e)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

18 U.S.C. § 3742 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

21 U.S.C. § 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

21 U.S.C. § 841(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

21 U.S.C. § 841(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

21 U.S.C. § 851 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 34

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

**CONSTITUTIONAL PROVISION:**

U.S. Const. amend V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**SENTENCING GUIDELINES:**

U.S.S.G. § 2D1.1(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

U.S.S.G. § 3E1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

U.S.S.G. § 4A1.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

U.S.S.G. § 5G1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

U.S.S.G. § 5K1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

U.S.S.G. § 7B1.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21, 23, 24

**RULES:**

Fed. R. App. P. 4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Crim. P. 32.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 26, 28

Fed. R. Crim. P. 32.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Fed. R. Crim. P. 32.1(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

Fed. R. Crim. P. 32.1(b)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**OTHER:**

N.C. Gen. Ann. Laws 1993
      § 1, eff. Oct. 1, 1994 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

# I.

## STATEMENT OF JURISDICTION

**A.    Basis for Subject Matter Jurisdiction in the District Court**

This appeal is from the sentence of Defendant-Appellant Clayton Bullin,

in the United States District Court for the Western District of North Carolina

before the Honorable Richard L. Voorhees.  The  district court  had jurisdiction

under 18 U.S.C. § 3231.

**B.    Basis for Jurisdiction in the Court of Appeals**

This Court has jurisdiction over appeals from final judgments under 28

U.S.C. § 1291.

**C.    The Notice of Appeal was Timely**

The Judgment in this case was entered on December 6, 2013.  JA at 224-26.[1]

Mr. Bullin timely filed a Notice of Appeal on December 6, 2013.  JA at 227-28;

Fed. R. App. P. 4(b).  Mr. Bullin appeals from a criminal judgment, a final order

appealable under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

---

[1]  "CR" refers to the Clerk's Record.  "JA " refers to the Joint Appendix
filed by both parties.  "RT" refers to the Reporter's Transcript.  "PSR" refers to the
Pre-Sentence Report.

1

**D.    The Judgment is Appealable**

A judgment in a federal criminal case is a final decision subject to appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## II.

### ISSUES PRESENTED

1.    The district court failed to balance the "interest[s] of justice" before denying Mr. Bullin the right to confront an adverse witness at his supervised release violation hearing.  Did the district court's failure violate Rule 32.1(b)(2)(C) of the Federal Rules of Criminal Procedure and/or the Due Process Clause of the Fifth Amendment?

2.    The district court failed to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct when it was determining the appropriate range under the USSG Chapter Seven policy statements and the statutory factors applicable to revocation sentences under 18 U.S.C. §§ 3553(a)(6) and 3583(e).  Did the district court's failure render the 60 month custodial sentence imposed procedurally and substantively unreasonable?

2

### III.

### STATEMENT OF THE CASE

**A.  Procedural and Factual History**

**1.  The Underlying Offense**

Mr. Bullin was one of three co-defendants indicted by a federal grand jury in a one-count Bill of Indictment filed in the Western District of North Carolina on August 24, 2004.[2]  JA at 12-13.  The indictment charged Mr. Bullin with conspiracy to possess with intent to distribute five kilograms or more of cocaine and 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846.  *Id*.  The offense was alleged to have occurred between January 1990 until August 2004, in Iredell County, NC.  *Id*.

On August 24, 2004, the Government filed a notice setting forth its intention to seek enhanced penalties pursuant to 21 U.S.C. §§ 841 and 851.  JA at 14.  On October 15, 2004, Mr. Bullin appeared before United States Magistrate Judge David C. Keesler and was ordered detained.  JA at 3.  On September 12,

---

[2]  On July 9, 1997, Mr. Bullin was arrested on a related North Carolina State case. After his release on bond, he appeared in North Carolina Superior Court on August 2, 2000, at which time he was found guilty of the related NC State offenses. He received a total of 70 months imprisonment for these offenses. On October 12, 2004, while in state custody, Mr. Bullin was arrested by federal authorities, pursuant to a writ.

2005, Mr. Bullin appeared before United States District Judge Richard L. Voorhees and pled guilty to the sole count of the indictment without the benefit of a written plea agreement. JA at 5.

On June 19, 2006, Mr. Bullin appeared for sentencing. JA at 5. At sentencing, Mr. Bullin faced a statutory minimum sentence of life imprisonment based on the § 851 enhancement. PSR at ¶ 59, JA at 241. Based upon Mr. Bullin's substantial assistance, however, the Government moved for a downward departure from the mandatory statutory minimum of life imprisonment to a range of 120 to 150 months. JA at 18-19. It ultimately recommended that the district court impose a sentence of 120 months imprisonment. JA at 19. Mr. Bullin argued at sentencing that pursuant to USSG § 5G1.3 the district court should depart further. JA at 23. After granting the Government's Motion for a Downward Departure per USSG § 5K1.1, and taking into account Mr. Bullin's related state sentence, the district judge sentenced Mr. Bullin to 60 months imprisonment followed by five years of supervised release. JA at 25. Mr. Bullin did not directly appeal his conviction or sentence. JA at 34-35.

On June 25, 2007, Mr. Bullin filed *pro se* motions to vacate, set aside, or correct his sentence on various bases. JA at 6. Those motions were denied by the district court on July 12, 2007 and October 24, 2007. JA at 34-38.

4

On July 16, 2008, Mr. Bullin filed both *pro se* and through counsel, motions to reduce his sentence. JA at 39-49. The government filed a response opposing the motions to reduce his sentence. JA at 50-56. Through counsel, Mr. Bullin filed a reply to the government's response. JA at 57-69. On February 27, 2009, the district court denied Mr. Bullin's motion to reduce his sentence. JA at 70-71.

## 2. The Violation Petition

Mr. Bullin was released from federal custody on October 26, 2010 and began serving a five year term of supervised release. JA at 72. Mr. Bullin's supervised release conditions included a term that he not commit a federal, state, or local crime. JA at 31.

On December 19, 2012, United States Probation Officer, (hereinafter "USPO"), Chelsea Padilla produced and filed a petition to revoke Mr. Bullin's supervised release (hereinafter "Petition"). JA at 72-81. The Petition alleged two violations of Mr. Bullin's conditions of supervised release. The first violation alleged that on December 17, 2012, "the defendant was found in possession of Methamphetamine, Cocaine, and Marijuana." JA at 72. The second violation alleged that on December 17, 2012, "the defendant admitted to manufacturing Methamphetamine." *Id*.

5

According to the Petition, on May 14, 2012, Mr. Bullin was placed on the low risk caseload. JA at 75. Apparently, the low risk caseload is comprised of those supervisees that the U.S. Probation Office determines need less supervision. USPO Padilla received the low risk case load in July, 2012. *Id*. On December 17, 2012, nearly five months later, USPO Padilla made contact with Mr. Bullin by arriving at his home, unannounced, with another probation officer, USPO Tim Goodman. Local law enforcement officers also were present for the unannounced visit. *Id*.

According to the Petition, Mr. Bullin had been the target of a local law enforcement investigation that spanned an entire year. JA at 75. Apparently, the local law enforcement officers who assisted the USPOs at Mr. Bullin's residence had been tracking Mr. Bullin's purchases of Sudafed and "provided intelligence" to USPO Padilla. *Id*. Local law enforcement believed that Mr. Bullin's purchases of Sudafed were consistent with the manufacturing of methamphetamine. *Id*. Finally, the Petition alleged that during the visit to his residence, Mr. Bullin admitted to USPOs Padilla and Goodman that he had been making methamphetamine. *Id*.

During this contact, local law enforcement searched Mr. Bullin's home and allegedly found a home-made pipe, needles, bands, tin foil and other drug

6

paraphernalia as well as the "precursors to a meth lab for the manufacturing of methamphetamine." *Id*. The Petition also alleged that cocaine, marijuana and methamphetamine were found. *Id*. Local law enforcement arrested Mr. Bullin for narcotics possession and the manufacturing of drugs. On June 6, 2013, Mr. Bullin waived his Preliminary Hearing. JA at 82.

On October 25, 2013, Mr. Bullin filed a *pro se* letter to the Clerk of the District Court regarding his request for a motion to suppress. JA at 85. On October 31, 2013, in anticipation of his revocation hearing, Mr. Bullin filed a *pro se* letter to the Clerk of the District Court making various requests. Notably, the letter included a request that subpoenas be issued for a number of probation officers, including USPO Padilla. JA at 87.

On November 4, 2013, Mr. Bullin filed *Pro Se* Motions for Appropriate Relief, to Dismiss the Petition and to Suppress Evidence. JA at 90-97. In this submission, Mr. Bullin emphasized his claim that the allegations set forth in the Petition were false and questioned the credibility of the witnesses present during the search of his home, including USPO Padilla. JA at 92, 94, 97. On November 6, 2013, Mr. Bullin's appointed counsel requested a continuance of the supervised release violation hearing, in part, because "Mr. Bullin has now given counsel a list of witnesses and information he wishes to be produced at the hearing." JA at 98.

7

### 3.    The Status Conference

On November 12, 2013, the parties appeared before the district court for a status conference.  JA at 10.  At the hearing, Mr. Bullin's attorney indicated that Mr. Bullin was prepared to admit that he possessed methamphetamine as alleged in the Petition's first allegation with a caveat.  JA at 102.  Mr. Bullin's attorney explained that although "Violation Number One" alleged that Mr. Bullin possessed cocaine, the lab reports indicated no cocaine was present.  Counsel indicated that while Mr. Bullin would be admitting to the possession of narcotics, he would not admit to possessing cocaine specifically.  JA at 102.

Mr. Bullin, however, maintained that he did not manufacture methamphetamine as alleged in Violation Number Two.  JA at 101.  The district court acknowledged that it had reviewed Mr. Bullin's *pro se* letters and motions and understood Mr. Bullin's position regarding Violation Number Two.  JA at 101-02.

The district court questioned Mr. Bullin about the various motions he had filed *pro se* despite being represented by counsel.  JA at 103.  Mr. Bullin responded by expressing concern that his attorney would not file timely motions.  *Id*.  However, Mr. Bullin ultimately expressed satisfaction with his attorney's

8

performance to date.  JA at 104.  Thereafter, Mr. Bullin's attorney withdrew Mr.

Bullin's *pro se* motions.  JA at 105.

Finally, Mr. Bullin's attorney also informed the court he anticipated an

evidentiary hearing:

> Your Honor, and as I have informed the court today, he is going to admit to a grade B violation.[3] If the government chooses to go forward with the grade A violations, then there are witnesses that Mr. Bullin is going to want to call that I have discussed with him that I believe are relevant. I know he's indicated a number of witnesses in the past, many of whom I thought were irrelevant to this case, but there would be -- he has some medical evidence that I think would be relevant and he has at least one fact witness that would be relevant on the hearing.

JA at 105-06.  The evidentiary hearing was set for December 2, 2013.  JA at 105.

### 4.    The Violation Hearing

The district court held a violation hearing on December 2, 2013.  JA at 10.

At the hearing, Mr. Bullin admitted to possessing methamphetamine and

marijuana as alleged in Violation Number One.  JA at 111-12, 113-14.  Mr. Bullin

denied Violation Number Two.  JA at 112.  After making his admission, the

Government noted the following for the court:

> [ ] Just one correction here to the petition.  It's listed as a grade A violation, this violation number one.  But that's a simple possession

---

[3]   The Petition erroneously identified Violation Number One as a Grade A violation.

9

charge. And so it doesn't satisfy the definition of a controlled substances offense for purposes of a grade A violation. So that actually should be -- and I've spoken with the probation officer about this, that should be a grade B violation. And so essentially what the defendant has done here is admitted the grade B violation, at least with respect to two of the substances alleged, and he is denying violation number two, which is the grade A violation.

JA at 112-13.

Mr. Bullin's attorney offered the following regarding the circumstances of

Violation Number One:

| Bullin: | When the probation officers arrived that day, your Honor, he was actually high on methamphetamine and marijuana. And what was found was the residue from what he had just finished using. |
|---|---|
| Judge: | All right. |
| Bullin: | I believe the lab report says what they found in a bag was $100 -- I'm not -- Judge, I'm not real good at reading these things. It's . -- .10. But it's -- I don't know if that's supposed to be a tenth of a gram. But I thought it was -- it was -- it says it was only residue is what they found. So... |
| Judge: | All right. The government may offer evidence. |

JA at 113-14.

After Mr. Bullin's admission to Violation Number One, the government

presented its evidence in support of Violation Number Two. The Government

presented two witnesses and documentary evidence to support the allegation. The

10

Government's first witness was USPO Goodman.  JA at 114-27.  He testified that

he made an unannounced contact visit with USPO Padilla.  He testified that he and

Padilla were following up on a number of cases that "had not been seen for a

while."  JA at 116.  He testified that he and USPO Padilla arrived in one car while

two other "officers" remained out of sight, in another car around the corner.  JA at

116.

USPO Goodman testified that he and USPO Padilla first encountered Mr.

Bullin on his front porch.  JA at 117.  He testified that Mr. Bullin appeared "very

nervous."  JA at 117-18.  His hands were shaking and he was sweating profusely.

*Id*.  Apparently, Mr. Bullin's anxiousness became worse over time.  *Id*.  According

to Goodman, USPO Padilla brought to his attention "drug paraphernalia" that she

had discovered in the living room.  JA at 118.  At that point, Goodman handcuffed

Mr. Bullin to a chair and said that his house would be searched.  *Id*.

Goodman called in the officers who were waiting in the car outside.  JA at

118-19.  USPO Goodman took Mr. Bullin outside while the other officers

searched the house.  JA at 119.  One of the probation officers announced that they

had found "precursors for a meth lab."  *Id*.  All of the occupants of the house then

exited and awaited the arrival of local law enforcement.  *Id*.

11

USPO Goodman testified that he read Mr. Bullin his *Miranda* rights prior to the arrival of local law enforcement,.[4]  JA at 120.  After the advisal, Mr. Bullin waived his rights and agreed to continue speaking to the probation officers.  According to Goodman, Padilla witnessed Mr. Bullin's *Miranda* advisal and waiver.  JA at 179.  Goodman stated that he had a "long" conversation with Mr. Bullin and that he was at Mr. Bullin's residence for a "significant" period of time.  JA at 121.

According to Goodman, Mr. Bullin initially denied any wrong-doing.  JA at 122.  After a long interrogation, however, Mr. Bullin admitted that he had begun using methamphetamine in February, 2012. Goodman testified that Mr. Bullin told him that "he would – he called it cook the meth in what he described as the shake and bake method, which my understanding is a method that can be pretty much done in your hand."  *Id*.  Goodman went on, testifying that "[Bullin] admitted [to] the methamphetamine and the marijuana that was there.  He told me that there was cocaine in the bedroom."  JA at 123.

Goodman prepared a written summary of Mr. Bullin's statements made during the interrogation.  According to Goodman, Mr. Bullin requested that

---

[4]  The executed Miranda Advisal and Waiver form was admitted into evidence.  JA at 179.

12

Goodman write out the statement for him. However, Mr. Bullin refused to sign the statement produced by Goodman.[5] JA at 124. According to Goodman, although Mr. Bullin refused to sign the statement, he acknowledged that it was accurate. *Id*.

On cross-examination, Goodman admitted that he did not ask Mr. Bullin if he was high at the time he was questioned. JA at 126. Goodman recalled that Mr. Bullin may have mentioned that he had used drugs earlier in the day but that he did not believe Mr. Bullin was impaired at the time of the interrogation. *Id*.

The Government's second witness was Kelly Ward. JA at 128-40. Kelly Ward testified that he was a Sergeant with the Alexander County Sheriff's Office. JA at 128. He was part of the local law enforcement response to USPO Goodman's request for assistance at Mr. Bullin's residence. JA at 133. Sergeant Ward indicated that while he had never met Mr. Bullin prior to arriving at his residence, Mr. Bullin was known to him as part of his work in narcotics investigations. JA at 130. He had been informed via a confidential informant and

---

[5] USPO Goodman's written summary of Mr. Bullin's statement was admitted into evidence. JA at 180.

13

a fellow law enforcement officer that Mr. Bullin was involved in regular monthly purchases of pseudoephedrine.[6] *Id*.

According to Sergeant Ward, he led the search of Mr. Bullin's residence. JA at 133-34. As part of the search, he allegedly discovered two bottles of degreaser, drain cleaner, carburetor cleaner, coffee filters, heat wraps, plastic tubing, cold compresses, hypodermic needles and a pill bottle.[7] JA at 134-39. He also collected drug samples from baggies that he sent off to the lab. JA at 139. On cross examination, Sergeant Ward admitted that what he described as "precursors" were also standard household items that people regularly keep around the home. JA at 141. Besides the household items that could be used as precursors in methamphetamine production, there was no evidence of an actual lab.

The defense presented two witnesses. The first witness was Mr. Bullin. JA at 145-157. Mr. Bullin testified that he didn't recall making a statement to anyone at his residence the day of the search. JA at 146. He testified that he was really high and "out of my mind." *Id*. He had been using methamphetamine for the two

---

[6] The government entered records of Mr. Bullin's prior pseudoephedrine purchases into evidence. JA at 181.

[7] Photos of the items found during Sergeant Ward's search were entered into evidence. JA at 194.

days prior and was "really strung out." *Id*. He said he saw the probation officers approach a neighbor's house and then, when they came up his driveway, they "spooked" him. *Id*. He also recalled that when USPO Padilla approached him, he thought that she introduced herself as "Bonnie Price." JA at 146.

Mr. Bullin testified that he was simply signing papers that the probation officers put in front of him and that he had no idea what he was signing. JA at 147. He claimed that "[The probation officers] knew I was messed up." *Id*. Still, he testified, the probation officers kept "throwing me kind of papers left and right." *Id*. Mr. Bullin also testified that he tried to tell the probation officers right away how he had obtained the methamphetamine through a local drug connection. JA at 146, 150. Mr. Bullin explained that he obtained the methamphetamine from a friend in Wilkesboro, and that he had not cooked any himself. *Id*.

Moreover, Mr. Bullin testified that as soon as the probation officers entered his residence that they were searching for a "meth lab." JA at 149. He testified that he was "freaking out" and repeatedly told the officers that "there ain't no lab." *Id*. He recalled USPO Goodman asking him whether he was "geekin'" and Mr. Bullin told him that he was indeed "geekin'." JA at 150. Mr. Bullin explained that "geekin'" was narcotic slang for a hallucinatory state that some drug users enter when using drugs for an extended period of time. *Id*. Mr. Bullin testified

15

that USPO Goodman agreed not to question him anymore based on Mr. Bullin's admission that he was high and hallucinating. *Id*. Nonetheless, Goodman continued the interrogation. JA at 150-51.

Mr. Bullin testified that Goodman handed him papers but when he tried to read them, he was incapable of doing so given his state. JA at 151. In reference to the voluntary statement about which USPO Goodman had testified earlier, Mr. Bullin recalled USPO Goodman reading a statement to him. Mr. Bullin testified that he told Goodman that the statement wasn't true and he wasn't going to sign it. *Id*.

Mr. Bullin testified that the items like the degreaser and drain cleaner that were found during the search of his residence were items he had for normal household purposes. JA at 147-48. Mr. Bullin testified that he didn't have any cold packs in the house but had a heat wrap that belonged to his girlfriend, who had knee problems. JA at 148.

Mr. Bullin also testified that he purchased Sudafed for an existing sinus problem that he has treated for the past two years. JA at 151. Mr. Bullin said that Sergeant Ward confronted him about his Sudafed purchases as soon as he arrived at his home. *Id*. Mr. Bullin said that he told Ward about his sinus condition and that Ward called him a "dam[n] liar." *Id*. Mr. Bullin testified that his sinus

16

problems required multiple emergency room visits that cost him in excess of $800.

JA at 151-52. After those experiences, he began buying Sudafed over the counter

because he had no insurance and could not afford hospital visits. JA at 152-53.

The boxes of pseudoephedrine were much cheaper than doctor visits. *Id*. He

testified that after years of cocaine abuse, his sinuses had suffered permanent

damage. *Id*. Mr. Bullin provided the district court with medical records, entered

into evidence, that corroborated his medical claims. JA at 217.

The second defense witness was Matthew Bullin—Mr. Bullin's son. JA at

157-158. Matthew Bullin testified that the carburetor cleaner belonged to him.

After Matthew Bullin's testimony, Mr. Bullin's attorney stated the following:

Bullin:       That's all the witnesses we'll tender, your Honor. Your
              Honor, I would like to put on the record Mr. Bullin has
              requested that I call [USPO] Padilla as a witness. And I
              have declined, I told him that I see no reason whatsoever
              to call her as a witness. But he wanted me to put on the
              record that he did wish her to be called and he be given
              an opportunity to question her. And I told him no, not
              going to do that.

The Court:    All right, sir. Very well. The government has the
              burden, so you may be heard.

JA at 158-59. The district court made no findings regarding Mr. Bullin's request

to call USPO Padilla or the apparent conflict between Mr. Bullin and his attorney

in that regard.

17

In arguing that it met its burden of proof, the Government relied primarily

on Mr. Bullin's alleged confession to the probation officers. JA at 159. The

Government argued that the court should disregard Mr. Bullin's in-court testimony

as "self-serving." *Id*. The Government also stated that USPO Goodman's

testimony was more credible because of his long-service as an officer of the court.

*Id*. The Government summed up its argument as follows:

> And so what this really comes down to, your Honor, is the credibility
> battle between the probation officer, who's been a probation officer
> for a very long time, and the Defendant, who denies what the
> probation officer has testified to.

JA at 160.

For his part, Bullin's attorney argued that Mr. Bullin's statement was

contested and, in any case, taken while Mr Bullin was under the influence of drugs

after a multi-day binge. JA at 161. He argued that the physical items seized by

the officers were common household items that were being used for legitimate

purposes. JA at 162. Bullin's attorney argued that Mr. Bullin had corroborated,

with medical records, his claim that the pseudoephedrine purchases were for

documented throat and sinus infections. *Id*. He argued that Mr. Bullin had been

forthright and candid in his testimony about his own addiction and his use of

methamphetamine. *Id*. Finally, he argued that had Mr. Bullin actually been

18

manufacturing methamphetamine, law enforcement would have found items at the residence—such as empty liter bottles—typically associated with meth manufacturing.  JA at 163.

The district court credited USPO Goodman's testimony and discounted Mr. Bullin's testimony:

> The Court finds that the Defendant did violate the terms of his supervised release with respect to manufacture of methamphetamine as alleged in the second count.  In that respect, the evidence of the probation officer corroborated by physical evidence at the residence constitutes a preponderance of the evidence, *outweighing the Defendant's self-serving testimony*.  You've got photographs speak strongly to that result, and the corroborating physical evidence is not subject to a credibility test, it is what it is, and it strongly suggests Defendant was engaged in the activity that he said he was to the probation officer.  So that being the case, you may be heard, counsel, on the matter of appropriate disposition.

JA at 163-64 (emphasis added).  Bullin's attorney urged the court to reconsider

Mr. Bullin's criminal history category per *United States v. Davis*, 720 F.3d 215

(4th Cir. 2013), which held that criminal cases consolidated under North Carolina

law did not count as separate offenses under the Federal Sentencing Guidelines.[8]

_____

[8]  Mr. Bullin's attorney drew the court's attention to particular convictions listed in Mr. Bullin's prior criminal history.  Specifically, on February 16, 1989, Mr. Bullin was arrested for a number of drug- related state misdemeanors in Case No. 89CR2292-94.  JA at 78.  On April 7, 1989, Mr. Bullin was arrested for traffic-related offenses in Case No. 89-4669. The two offenses were consolidated for the purpose of sentencing in state court but counted for three total points for

JA at 164-66.  Further, he argued that the district court should consider that had

Mr. Bullin been sentenced under the Fair Sentencing Act, (hereinafter "FSA"), on

the underlying offense, which was enacted after he was sentenced, his original

sentence would have been much lower.  JA at 166-67.  Specifically, he argued:

> [ ]when Mr. Bullin appeared before you originally for sentencing he
> was looking at a mandatory life sentence.  At that time he received a
> downward departure from the government and at sentencing
> eventually he was sentenced, as I recall, to 60 months.  And he had --
> he never -- he didn't receive any benefits from the crack -- he was
> being sentenced for crack.  He didn't receive any sentence from the
> crack sentence reduction rounds that were had with the guideline
> changes or with the Fair Sentencing Act changes.  I think he'd already
> served his time by the time the Fair Sentencing Act had come out.
>
> If he would be calculated today, my calculation is that he would be
> a -- he would be a level 31 -- he would no longer be mandatory life,
> he would be a level 31 based on 840 to 2.8 kilo- -- 840 grams to 2.8
> kilograms of cocaine base, and he would have non-criminal history
> points, which would be 151 to 188 months.

---

criminal history purposes.  *Id*.  Mr. Bullin argued that the traffic-related offense,
which scored one point, should not have been counted.

On February 6, 1990, Mr. Bullin was arrested for drug-related state
misdemeanors in Case No. 90CRS1918, 1921-22.  *Id*.  On December 19, 1990,
Mr. Bullin was arrested for additional drug-related misdemeanors in Case No.
90CRS17363-65.  JA at 79.  The two offenses were consolidated for the purpose
of sentencing in state court but accounted for six total points for criminal history
purposes.  Mr. Bullin argued that the two offenses combined should have scored
three points total.

20

JA at 166-67.  Mr. Bullin argued that the court should impose a lower sentence on

the violation in light of the higher penalties Mr. Bullin suffered for the underlying

offense, prior to *Davis* and the FSA.  *Id.*  As such, Bullin urged a range of 37 to 46

months.  JA at 167.[9]

The Government argued that the district court should not vary downward

from the recommended guideline range.  JA at 168-69.  It argued that *Davis* had

no application to the case.  JA at 169.  The government also noted that Mr. Bullin

was facing a mandatory life sentence when he appeared before the court on the

underlying offense.  JA at 170.  Finally, the government argued that the 18 U.S.C.

§ 3553 factors, in particular Mr. Bullin's abuse of the court's and probation's trust,

weighed in favor of a 60 month sentence.  JA at 170-71.

After noting the parties' arguments, the court sentenced as follows:

> The Court will sentence Defendant to 60 months finding that he did --
> in terms of his own characteristics, has shown that he has little innate
> resistance to returning to criminal conduct and this effects the
> protection of the public and invokes that factor among the 3553(a)
> factors to be considered in determining the sentence.  It's a serious
> offense, creating risk to himself and others at the house and that the at
> the university.  Any -- any lesser sentence would not promote respect
> for the law, but exactly the opposite.  In terms of Defendant's -- the
> nature and circumstances of the offense, the Defendant contends that

---

[9]   This guideline range corresponds to a defendant who is found to have
committed a Grade A violation, in Criminal History Category IV, and who was on
supervised release for Class A felony.  USSG § 7B1.4.

he should be excused because of his family wasn't supporting him, but he brought that on himself. There will be no supervised release to follow.

* * * *

The Court does not accept Defendant's counsel's argument about the calculation of the guidelines since the Court is appropriately using the original calculation and criminal history. In any event, there hasn't been a Fourth Circuit decision applying the Davis rationale to criminal history category determination. So that 60 months is an individualized sentence.

JA at 173-74. This appeal follows.

# IV.

## SUMMARY OF ARGUMENT

Mr. Bullin appeals the district court's judgment revoking his supervised release and sentencing him to sixty months in prison. The district court erred in two ways. First, the district court erred when it failed to conduct any balancing test before denying Mr. Bullin's right to confront a witness, despite the explicit requirement that it do so. U.S. Const. V; Fed. R. Crim. P. 32.1(b)(2)(C). Here, Mr. Bullin asserted his right to confront and question USPO Padilla. Mr. Bullin's assertion of his right to confront USPO Padilla, the only other percipient witness to the events that were the subject of controversy at the violation hearing, was made directly and explicitly to the court by Mr. Bullin, in both his written *pro se* submissions prior to the violation hearing (JA at 87 92, 94, 97) and at the violation

22

hearing itself (JA at 158-59). Instead of balancing the interests of justice before denying Mr. Bullin's right of confrontation, the district court simply disregarded it without making any findings. This failure violated Rule 32.1(b)(2)(C) of the Federal Rules of Criminal Procedure and the Due Process Clause of the Fifth Amendment.

Second, the district court erred when it failed to consider that Mr. Bullin's applicable guideline range was at odds with the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. §§ 3583(e) and 3553(a)(6). It should have considered this factor when it decided the appropriate range under the USSG Chapter Seven policy statements and the statutory factors applicable to revocation sentences under 18 U.S.C. §§ 3553(a) and 3583(e). Its failure to do so resulted in a sentence that was procedurally and substantively unreasonable.

# V.

## ARGUMENT

**A.  The District Court Failed to Comply with the Fifth Amendment Right to Due Process and Federal Rule of Criminal Procedure 32.1(b)(2)**

### 1.  The Standard of Review

This Court typically reviews a decision to revoke a defendant's supervised release for an abuse of discretion. *United States v. Doswell*, 670 F.3d 526, 529 (4ᵗʰ Cir. 2012).  Abuse of discretion applies even when a defendant does not invoke Fed. R. Crim. P. 32.1(b)(2)(C) by name but objects with sufficient specificity as to call the court's attention to the nature of the alleged error.  *Id* at 530 (citing *Duty v. East Coast Tender Service, Inc.*, 660 F.2d 933, 941 (4ᵗʰ Cir. 1981)).  Furthermore, "[a] district court abuses its discretion when it. . . fails to consider judicially recognized factors constraining its exercise of discretion." *United States v. Delfino*, 510 F.3d 468, 470 (4ᵗʰ Cir. 2007).

Although Mr. Bullin believes that the district court abused its discretion here, Mr. Bullin believes *de novo* review is the more appropriate standard because he alleges violations of both his statutory rights under Fed. R. Crim. P. 32.1 and his right to due process under the Fifth Amendment of the United States Constitution. *See United States v. Lloyd, Jr.*, 566 F.3d 341, 344 (3rd Cir. 2009)

24

(where the district court made no attempt to conduct the analysis required by Rule 32.1(b), the review is *de novo)*; *United States v. Minnitt*, 617 F.3d 327, 332 (5th Cir. 2010) (reviewing, *de novo*, defendant's claim that admission of hearsay evidence at a supervised release revocation hearing violated his due process right to confrontation); *see also Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 278 (4th Cir. 2004) (this court reviews legal issues, including claims of due process violations, *de novo)*; *United States v. Legree*, 205 F.3d 724, 728 (4th Cir. 2000) (we review the alleged denial of due process *de novo*).

### 2. Due Process and Federal Rule of Criminal Procedure 32.1(b)(2) in the Context of a Supervised Release Violation Hearing

Federal Rule of Criminal Procedure 32.1(b)(2) sets forth the rights afforded to defendants at a supervised release revocation hearing. Those rights include "an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." Fed. R. Crim. P. 32.1(b)(2)(C).

The defendant's right to confront adverse witnesses in Rule 32.1 is rooted in due process concerns. *Doswell*, 670 F. 3d at 530. As noted by this Court, the rights set forth in the current version of Fed. Rule 32.1 specifically incorporate holdings by the United States Supreme Court that applied due process principles

25

to revocation hearings. *Doswell*, 670 F.3d at 530 (citing *Morrisey v. Brewer*, 408 U.S. 471, 489 (1972) and *Gagnon v. Scarpelli*, 411 U.S. 778, 781-82 (1973)).

According to the plain language of the rule, while a defendant's right to confront witnesses at a revocation hearing is not absolute, the defendant is "entitled" to a right to confront adverse witnesses unless "the interest of justice does not require the witness to appear." Fed. R. Crim. P. 32.1(b)(2)(C). As noted by this Court:

> [I]n 2002, Rule 32.1 was substantially amended to provide that a releasee subject to revocation proceedings "*is entitled* to ... question any adverse witness *unless the court determines that the interest of justice does not require the witness to appear.* " Fed. R. Crim. P. 32.1(b)(2)(C) (emphases added). The Advisory Committee explained that this amendment "recognize[s] that the court should apply a balancing test at the hearing itself when considering the releasee's asserted right to cross-examine adverse witnesses." Fed. R. Crim. P. 32.1 advisory committee's note (2002). Specifically, "[t]he court *is* to balance the person's interest in the constitutionally guaranteed right to confrontation against the government's good cause for denying it." *Id.*

*Doswell*, 670 F.3d at 530 (emphasis added in original). Rule 32.1(b)(2)(C) "specifically requires that, prior to admitting hearsay evidence in a revocation hearing, the district court must balance the releasee's interest in confronting an adverse witness against any proffered good cause for denying such confrontation." *Id*.

The defendant's interest in confronting adverse witnesses during revocation proceedings is not to be taken lightly. As noted by the Seventh Circuit:

> Cross-examination provides an opportunity "to expose a witness's motivation for testifying, his bias, or his possible incentives to lie." *United States v. Recendiz*, 557 F.3d 511, 530 (7th Cir. 2009); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). Where, as here, a person's liberty is at stake, the opportunity to confront witnesses and reveal problems with their testimony is an important component of due process. When liberty is at stake, the limited right to confront and cross-examine adverse witnesses [in revocation proceedings] should not be denied without a strong reason.

*United States v. Jordan*, 742 F.3d 276, 279 (7th Cir. 2014). Given the gravity of the right at stake, the district court must "*explicitly* [ ] balance the defendant's constitutional interest in confrontation and cross-examination against the government's stated reasons for denying them. This requirement lines up well with the *Morrissey* requirement that the courts specifically find good cause to admit hearsay in parole revocation hearings." *Id.* at 280 (citing *Morrissey*, 408 U.S. at 489) (emphasis added)). In other words, the district court must have good reasons, and state them on the record, before it denies a defendant's fundamental right to confront an adverse witness. *Doswell*, 670 F.3d at 529.

27

**3.    The District Court Failed to Comply with Requirements Under Fed. R. Crim. P. 32.1 and the Due Process Clause of the Fifth Amendment That It Explicitly Balance the Interests of Justice Before Denying Mr. Bullin's Right to Confront a Witness.**

The district court erred when it failed to conduct *any* balancing test before denying Mr. Bullin's right to confront a witness, despite the explicit requirement that it do so. "The court is to balance the person's interest in the constitutionally guaranteed right to confrontation against the government's good cause for denying it." Fed. R. Crim. P. 32.1 Advisory Committee's Note (2002). Here, Mr. Bullin asserted his right to confront and question USPO Padilla. Mr. Bullin's assertion of his right to confront USPO Padilla, the only other percipient witness to the events that were the subject of controversy at the violation hearing, was made directly and explicitly to the court by Mr. Bullin, in both his written submissions prior to the hearing (JA at 87 92, 94, 97) and at the violation hearing itself (JA at 158-59).

Moreover, USPO Padilla's relevance to these proceedings should have been obvious to the district judge at the time he asserted the right. After all, USPO Padilla drafted and submitted the Petition to the district judge in which she claimed that Mr. Bullin admitted *to her* that he had manufactured methamphetamine. JA at 75. In fact, in noting for the court the nature of Mr. Bullin's non-compliance with respect to the contested violation, the *only* evidence

28

she cited for the district court was that "[o]n 12/17/2013 the defendant admitted to manufacturing Methamphetamine." JA at 72. Thus, Mr. Bullin's alleged admission was a crucial part of the proceedings and Mr. Bullin should have been allowed to test USPO Padilla's version of events against USPO Goodman's. The hearing, otherwise, was simply a credibility contest between USPO Goodman and Mr. Bullin.

The district court's credibility determination in favor of Goodman highlights how critical it was to its preponderance finding. The district court found Mr. Bullin's version of events unbelievable and "self-serving." However, questioning Padilla under oath may have revealed inconsistencies with Goodman's testimony—thereby calling both Goodman's and Padilla's reliability into question. Thus, the opportunity to question Padilla was an important due process right that was denied Mr. Bullin without explanation. Under these circumstances, Mr. Bullin's request should not have been denied without a strong reason. The court, however, offered no reason at all.

When Mr. Bullin stated his request to call USPO Padilla at the violation hearing, Mr. Bullin's attorney stated that he simply saw no reason to call her. Such a conclusion is strange in light of the fact that even the government thought that "what this [case] really comes down to" is a "credibility battle between the

29

probation officer, who's been a probation officer for a very long time, and the

Defendant, who denies what the probation officer has testified to."  JA at 160.  In

any event, what Mr. Bullin's attorney thought about the relevance of Padilla as a

witness is beside the point because Rule 32.1 and Due Process required that the

*judge* independently and explicitly balance interests when the *defendant* invokes

his right to call a witness.  An attorney's assessment cannot supplant the court's

own judgment.  Nor can it negate the requirement that the court balance the

"interest of justice" before denying a defendant's right of confrontation.

Finally, the government did not offer any reasons why USPO Padilla should

not be called.  In other words, there was no opposition to Mr. Bullin's request.

Under these circumstances, the judge should have granted Mr. Bullin his right of

confrontation or, in the alternative, made explicit findings demonstrating good

cause for denying Mr. Bullin's request.  It did neither and in the absence of any

record on this point, this case must be remanded.

**4    A Review of the Record Reveals That Any Balancing of Interests
Would Have Weighed in Favor of Mr. Bullin's Right of
Confrontation.**

Putting aside the absence any judicial reasons for denying Mr. Bullin's

request, the record reveals that had the district court balanced interests, it would

have come out in favor of allowing Mr. Bullin to call the witness.  After all, the

30

government's main argument after presenting its case to the court was that it had met its burden because USPO Goodman, who had been a probation officer for a long time, was more credible than Bullin, a previously convicted felon.

Unsurprisingly, the court's conclusion that Mr. Bullin was guilty of Violation Number Two was also based in large part on that premise – USPO Goodman was credible and his testimony was corroborated by physical evidence [10] while Mr. Bullin's testimony was merely "self-serving." Cross-examining the other percipient witness, USPO Padilla could have undermined USPO Goodman's credibility, impacted the court's credibility findings and ultimately, its conclusion to revoke his supervised release. Further, the government offered no reason that would factor against making this witness available to Mr. Bullin. Any balancing test that this Court might perform now, given the district court's failure to do so, should weigh in favor of Mr. Bullin's right of confrontation.

---

[10]    As noted above, Mr. Bullin testified that the items seized by the government as "precursors" to a meth lab were only normal household items used by him for non-criminal purposes and not for the manufacturing of methamphetamine. JA at 147-48. If the district court had found Mr. Bullin's testimony credible, then the physical evidence would not have factored against him as those items were indeed common household items. Thus, even the physical evidence was colored by the district court's credibility findings despite its proclamation that such items were "not subject to a credibility test." JA at 163-64.

31

**B.    The District Court Imposed an Unreasonable Sentence**

**1.    Standard of Review**

This Court reviews whether the sentence imposed after revocation is within the prescribed statutory range and is plainly unreasonable. *United States v. Crudup*, 461 F.3d 433, 439-40 (4th Cir. 2006). In its review of a revocation sentence, this Court shows more deference to the district court with regard to issues of fact and the exercise of discretion than it does when reviewing guidelines sentences. *United States v. Mouldren*, 478 F.3d 652, 656 (4th Cir. 2007). Upon finding that the sentence is procedurally or substantively unreasonable, this Court then decides whether it is "plainly" so. *Id*. at 657.

A district court must consider the Chapter Seven policy statements and the statutory factors applicable to revocation sentences under 18 U.S.C. §§ 3553(a) and 3583(e). *Id*. at 656-57. The district court must also provide a statement of reasons for the sentence, although the district court need not be as detailed or specific when imposing a revocation sentence as when imposing a post-conviction sentence. *United States v. Thompson*, 595 F.3d 544, 547 (4th Cir. 2010).

32

**2.    The District Court Imposed the Maximum Possible Sentence, but in So Doing, Did Not Account for the Need to Avoid Unwarranted Sentencing Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.**

As noted above, Mr. Bullin's urged the court to reconsider his criminal history category per *Davis*, 720 F.3d 215 (4th Cir. 2013).  JA at 164-66.  Bullin noted that some of his prior convictions were consolidated for sentencing under North Carolina law and should not have been counted separately under § 4A1.2. He argued that under *Davis*, the consolidated sentences actually scored four points lower than what was calculated in the PSR for his underlying offense.

Further, Mr. Bullin's attorney argued that the district court should consider that had Mr. Bullin been sentenced under the FSA on the underlying offense, which was enacted after he was sentenced, his original sentence would have been much lower.  JA at 166-67.  Other defendants had benefitted from the changes to the crack guidelines and Mr. Bullin was not one of them.  *Id.*  As such, he argued that the court should impose a lower sentence in light of the higher penalties Mr. Bullin had suffered when he was sentenced on the underlying offense, prior to the favorable changes in the legal landscape for consolidated sentences under *Davis* and crack offenses under the FSA.  *Id.*

In response, the court found that *Davis* did not apply and adhered to the

original Criminal History Category VI for determining the appropriate revocation

guideline range.  While it is true that the North Carolina sentence consolidation

provision at issue in *Davis* is not in play here,[11] the court did not consider, *at all*,

the FSA and its impact on defendants who have been sentenced for similar

conduct after its enactment.[12]  Both arguments by Bullin's attorney underscore an

---

[11]   The convictions listed by Mr. Bullin's attorney occurred prior to the enactment of North Carolina's consolidated sentence provision.  *Davis*, at 720 F.3d at 219 (citing N.C. Gen. Ann. Laws 1993, c. 538, § 1, eff. Oct. 1, 1994). Because these convictions were subject to a prior version of the law and were separated by intervening arrests, they appear to be properly scored.  *Id*.

[12]   Mr. Bullin's underlying offense was a Class A felony under pre-FSA law.  *See* 21 U.S.C. § 841(b)(1)(A) (2006) (providing for a maximum penalty of life in prison) and 18 U.S.C. § 3559 (defining offenses with a maximum penalty of life in prison as Class A felonies).  18 U.S.C. § 3583(e)(3) authorizes a statutory maximum of five years in prison upon revocation of supervised release if the underlying offense was a Class A felony.  Even after the enactment of the FSA, Mr. Bullin's underlying offense would remain a Class A felony because the government had filed a § 851 enhancement.  *See* 21 U.S.C. § 841(b)(1)(B) (2013) (providing for a maximum penalty of 40 years if the offense involved 28 grams or more (but less than 280 grams) of cocaine base but increasing that maximum penalty to life if the defendant has a prior conviction for a felony drug offense). Thus, the maximum sentence Mr Bullin faced upon revocation of supervised release on the underlying offense remained the same (five years) regardless of the FSA.  The sentencing guidelines for crack that applied at the time of his original sentence, however, are much lower for defendants today, even when a § 851 enhancement is filed.  The PSR calculated Mr. Bullin's final offense level after acceptance at level 35. *See* JA at 236.  Post-FSA, Mr. Bullin's final offense level after acceptance would be a 31.  *See* USSG §§ 2D1.1(c)(3) and 3E1.1.

34

important point that the district court disregarded when imposing its sentence—the district court should have considered § 3553(a)(6) prior to imposing sentence.

**3.    The District Court Committed Procedural Error when It Failed to Consider and Weigh 3553(a)(6) and  Adequately Explain How the Maximum Sentence it Imposed Was Justified.**

The district court committed procedural error when it failed to consider and weigh § 3553(a)(6) and adequately explain how the maximum sentence it imposed was justified.  A district court is required to state the reasons for the sentence imposed in enough detail to satisfy an appellate court that it has "considered the parties' arguments and has a reasoned basis for exercising [its] own legal decision making authority." *Rita v. United States*, 551 U.S. 338, 356, 127 S. Ct. 2456, 168 L. Ed. 2d 203 (2007).  The extent of the explanation necessarily depends on the circumstances of each case. *Id.* at 357, 127 S. Ct. 2456. "Circumstances may well make clear that the judge rests his decision upon the Commission's own reasoning that the Guidelines sentence is a proper sentence (in terms of § 3553(a) and other congressional mandates) in the typical case, and that the judge has found that the case before him is typical." *Id.*  "Where the defendant or prosecutor presents non-

---

This important distinction was not explored by the court and weighed in favor of a sentence below the maximum one it imposed.

35

frivolous reasons for imposing a different sentence, however, the judge will normally go further and explain why he has rejected those arguments." *Id*.

Here, the district court provided no reason why it ignored Bullin's sentencing disparity argument per the FSA. What is more, the government offered no counter-argument on this mitigating factor. Instead of considering this important, and apparently undisputed, point in favor of mitigation, the district court bypassed the required 3553(a)(6) analysis altogether. Instead, it focused exclusively on aggravating § 3553(a) factors.

The procedural error here is "plain" because 18 U.S.C. § 3583(e) specifically cross-references the 3553(a) factors the court must consider before imposing sentence upon revocation.[13] Mr. Bullin's attorney specifically argued that the district court should consider sentencing benefits now available to defendants under the FSA that just a few years earlier were not available to Mr. Bullin. Despite pointing out this sentencing disparity, the district court skipped over consideration of this factor—simultaneously leaving no record for this Court to engage in a meaningful review.

---

[13]   The court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(4), (a)(5), *(a)(6)*, and (a)(7) . . . revoke a term of supervised release, and require the defendant to serve in prison all of part of the term of supervised release authorized by statute [ ]. *See* 18 U.S.C. § 3583(e) (emphasis added).

The absence of a record renders Mr. Bullin's sentence procedurally unreasonable and requires remand. This Court has remanded on such a basis in other sentencing contexts. *see United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009) ("Procedural errors include . . . failing to adequately explain the chosen sentence-including an explanation for any deviation from the Guidelines range") (internal quotation marks omitted)); *see also United States v. Bautista-Villanueva*, 2013 WL 6098425 at *1 (4th Cir. 2013) (remanding to the district court for its failure to perform an individualized assessment of the propriety of imposing a term of supervised release upon the defendant sufficient for the Court to conduct meaningful appellate review).

4.      **The Sentence Is Substantively Unreasonable Because the District Court Appeared to Give Too Much Weight to Some Factors at the Expense of § 3553(a)(6) Factors That Were Presented by Bullin.**

While the district court considered some of the relevant § 3553(a) factors, such as Mr. Bullin's individual circumstances, the offense conduct, and the need to protect the public from future crimes, it paid no heed to the unwarranted sentencing disparities factor. Thus, the district court did not consider 3553(a)(6) prior to imposing sentence here. Had it done so, it may have properly varied from the applicable guidelines given the dramatic reduction in the guidelines range for defendants sentenced under the post-FSA regime.

37

Moreover, other courts have held that a district court abuses its discretion in weighing the relevant § 3553(a) factors by giving too much weight to one factor and not enough weight to the other relevant § 3553(a) factors." *See United States v. Ressam*, 679 F.3d 1069, 1092-93 (9th Cir. 2012) (*en banc*); *see also United States v. Paul*, 561 F.3d 970 (9th Cir. 2009) (district court's excessive reliance on one aggravating factor (abuse of trust) while not giving sufficient consideration to other mitigating factors was substantively unreasonable)).  Like *Ressam* and *Paul*, the district court's focus here on some aggravating factors caused it to omit any meaningful consideration of other factors making the sentence imposed substantively unreasonable.  *See Ressam*, 679 F.3d at 1092-94 (9th Cir. 2012) (*en banc*).

The district court's failure here resulted in a sentence that was substantively unreasonable.  The substantive unreasonableness of the sentence is "plain" because, again, 18 U.S.C. 3583(e) clearly mandates consideration of all of the relevant 3553(a) factors before imposing a custodial sentence upon revocation.

38

## VI.

## CONCLUSION

On the basis of the foregoing Mr. Bullin respectfully requests that this Court vacate the finding of revocation, the resulting 60 month sentence and remand his case to the district court for further proceedings.

## VII.

## REQUEST FOR ORAL ARGUMENT

Mr. Bullin respectfully requests oral argument which will help this Court in its decision-making process.

March 19, 2014                              *s/Michelle Anderson Barth*
                                           Michelle Anderson Barth
                                           LAW OFFICE OF
                                             MICHELLE ANDERSON BARTH
                                           P. O. Box 4240
                                           Burlington, VT  05406
                                           (619) 894-7817

                                           *Counsel for Appellant*

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**
**Certificate of Compliance with Type-Volume Limitation,**
**Typeface Requirements, and Type Style Requirements**

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

        this brief contains <u>8,794</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

        this brief has been prepared in a proportional spaced typeface using <u>WordPerfect</u> in <u>14 point Times New Roman</u>.

<u>/s/ Michelle Anderson Barth</u>
Michelle Anderson Barth

Dated: March 19, 2014

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on March 19, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Amy Elizabeth Ray
OFFICE OF THE
  UNITED STATES ATTORNEY
United States Courthouse
100 Otis Street, Room 233
Asheville, NC  28801
(828) 271-4661

*Counsel for Appellee*

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Shelly N. Gannon
Shelly N. Gannon
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street
Suite 230
Richmond, VA  23219